UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------- X

ANNE HALL,  :
  :
              Plaintiff,  :      CASE NO.: _____
  :
   -against-  :      COMPLAINT
  :
QIAGEN N.V., THIERRY BERNARD,  :      JURY TRIAL DEMANDED
HÅKAN BJÖRKLUND, STÉPHANE  :
BANCEL, METIN COLPAN, ROSS L.  :
LEVINE, ELAINE MARDIS, LAWRENCE A.  :
ROSEN, and ELIZABETH E. TALLETT,  :
  :
            Defendants.  :

--------------------------------------- X

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff Anne Hall ("Plaintiff"), on behalf of herself, by and through her attorneys, alleges the following upon information and belief, including the investigation of counsel and a review of publicly available information, except as to those allegations pertaining to herself, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1.     This is an action brought by Plaintiff against QIAGEN N.V. ("QIAGEN" or the "Company"), its Chief Executive Officer, and the members of the Company's Supervisory Committee (collectively referred to as the "Board" or the "Individual Defendants" and, together with QIAGEN, the "Defendants") for their violations of Sections 14(d)(4), 14(e), and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(d)(4), 78n(e), 78t(a), respectively, and United States Securities and Exchange Commission ("SEC") Rule 14d-9, 17 C.F.R. §240.14d-9(d) ("Rule 14d-9"). Plaintiff's claims arise in connection with the tender offer by Quebec B.V., a Dutch entity and wholly-owned subsidiary of Thermo Fisher Scientific, Inc.

("TFS") to acquire all of the outstanding ordinary shares of the Company (the "Tender Offer" or "Transaction").

2.  On March 3, 2020, QIAGEN entered into a business combination agreement (the "Merger Agreement"), pursuant to which, Quebec B.V. will purchase all of QIAGEN's outstanding ordinary shares for €39.00 (approximately $42.84) in cash per share ("Offer Price").

3.  On May 18, 2020, in order to convince QIAGEN's stockholders to tender their shares, Defendants authorized the filing of a materially incomplete and misleading Schedule 14D-9 Solicitation/Recommendation Statement (the "Recommendation Statement") with the SEC. Specifically, the Recommendation Statement was incomplete and misleading information concerning three categories of material information: (i) the valuation analyses performed by QIAGEN's financial advisors Barclays Bank PLC ("Barclays") and Goldman Sachs International ("Goldman Sachs" and together with Barclays, the "Financial Advisors"); (ii) whether the confidentiality agreements signed with other bidders contained restrictive 'Don't Ask, Don't Waive' clauses ("DADW"); and (iii) full disclosure of the compensation to be received by the Financial Advisors, as well as all potential conflicts of interest.

4.  The Tender Offer is set to expire at 6:00 P.M. (Eastern Standard Time) on July 27, 2020 (the "Expiration Time"). It is imperative that the material information that has been omitted from the Recommendation Statement is disclosed to the Company's stockholders prior to the Expiration Time so they can properly determine whether to tender their shares.

5.  For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for their violations of Sections 14(d)(4), 14(e), and 20(a) of the Exchange Act and Rule 14d-9.  Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Tender Offer unless and until the material information discussed below is disclosed to QIAGEN's stockholders

sufficiently in advance of the Expiration Time or, in the event the Tender Offer is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act and 28 U.S.C. § 1331 because the claims asserted herein arise under Sections 14(d)(4), 14(e), and 20(a) of the Exchange Act and Rule 14d-9.

8.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

9.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, the conduct at issue will have an effect in this District, a substantial portion of the Transaction occurred here, and certain Defendants have or will receive substantial compensation by doing business in this District. Furthermore, QIAGEN's common stock trades on the New York Stock Exchange ("NYSE"), which is headquartered in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

**PARTIES**

10.     Plaintiff is, and has been continuously throughout all times relevant hereto, the holder of QIAGEN common stock.

11.     Defendant QIAGEN is a Dutch entity that maintains its corporate seat in The Netherlands and trades its common stock on the NYSE under the ticker symbol "QGEN."

12.     Defendant Thierry Bernard is, and has been at all relevant times, the Company's Chief Executive Officer.

13.     Defendant Håkan Björklund is, and has been at all relevant times, a director of the Company and Chairman of the Supervisory Board.

14.     Defendant Stéphane Bancel is, and has been at all relevant times, a director of the Company's Supervisory Board.

15.     Defendant Metin Colpan is, has been at all relevant times, a director of the Company's Supervisory Board.

16.     Defendant Ross L. Levine is, and has been at all relevant times, a director of the Company's Supervisory Board.

17.     Defendant Elaine Mardis is, and has been at all relevant times, a director of the Company's Supervisory Board.

18.     Defendant Lawrence A. Rosen is, and has been at all relevant times, a director of the Company's Supervisory Board and Chairman of the Audit Committee.

19.     Defendant Elizabeth E. Tallett is, and has been at all relevant times, a director of the Company's Supervisory Board and Chairwoman of the Compensation Committee.

20.     The defendants identified in paragraphs 12 through 19 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with QIAGEN, the

"Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Transaction and the Unfair Offer Price**

21.    QIAGEN is a leading provider of life science and molecular diagnostic solutions and has approximately 5,100 employees at 35 locations in more than 25 countries. QIAGEN generated sales for 2019 of $1.53 billion. Its sample preparation technologies are used to extract, isolate and purify DNA, RNA and proteins from a wide range of biological samples. QIAGEN's assay technologies are then used to amplify and enrich these biomolecules to make them readily accessible for analysis. In addition, QIAGEN's instruments can be used to automate these workflows, while its bioinformatics systems provide customers with relevant, actionable insights.

22.    TFS serves customers working in pharmaceutical and biotech companies, hospitals and clinical diagnostic labs, universities, research institutions and government agencies, as well as environmental, industrial quality and process control settings. It delivers technologies for purchasing convenience and pharmaceutical services through industry-leading brands, including Thermo Scientific, Applied Biosystems, Invitrogen, Fisher Scientific, Unity Lab Services and Patheon. In the fiscal year ended December 31, 2019, TFS generated sales revenues of $25.5 billion, operating income of $4.6 billion and net income of $3.7 billion.

23.    On March 3, 2020, QIAGEN authorized a press release announcing the Tender Offer, which states in relevant part:

//

//

//

//

5

**Thermal Fisher Scientific to Acquire QIAGEN N.V.**

WALTHAM, Mass. and VENLO, The Netherlands – March 3, 2020 – Thermo Fisher Scientific Inc. (NYSE: TMO), the world leader in serving science, and QIAGEN N.V. (NYSE: QGEN; Frankfurt Prime Standard: QIA), a leading global provider of molecular diagnostics and sample preparation technologies, today announced that their boards of directors, as well as the managing board of QIAGEN N.V., have unanimously approved Thermo Fisher's proposal to acquire QIAGEN for €39 per share in cash. The offer price represents a premium of approximately 23% to the closing price of QIAGEN's common stock on the Frankfurt Prime Standard on March 2, 2020, the last trading day prior to the announcement of the transaction. Thermo Fisher will commence a tender offer to acquire all of the ordinary shares of QIAGEN.

The transaction values QIAGEN at approximately $11.5 billion at current exchange rates, which includes the assumption of approximately $1.4 billion of net debt.

"We are excited to bring together our complementary offerings to advance our customers' important work, from discovery to diagnostics," said Marc N. Casper, chairman, president and chief executive officer of Thermo Fisher Scientific. "This acquisition provides us with the opportunity to leverage our industry-leading capabilities and R&D expertise to accelerate innovation and address emerging healthcare needs. For shareholders, we expect the transaction to be immediately accretive and to generate significant cost and revenue synergies."

QIAGEN is a leading provider of life science and molecular diagnostic solutions and employs approximately 5,100 people at 35 locations in more than 25 countries. The company generated 2019 revenue of $1.53 billion. Its sample preparation technologies are used to extract, isolate and purify DNA, RNA and proteins from a wide range of biological samples. The company's assay technologies are then used to amplify and enrich these biomolecules to make them readily accessible for analysis. In addition, QIAGEN's instruments can be used to automate these workflows, while its bioinformatics systems provide customers with relevant, actionable insights.

"Our vision at QIAGEN has always been to make improvements in life possible with our differentiated Sample to Insight molecular testing solutions," said Thierry Bernard, interim chief executive officer of QIAGEN N.V. and senior vice president, head of the molecular diagnostics business area. "This strategic step with Thermo Fisher will enable us to enter a promising new era and will give our employees the opportunity to have an even greater impact. The combination is designed to deliver significant cash value to our shareholders, while enabling us to accelerate the expansion of our solutions to provide customers worldwide with breakthroughs that advance our knowledge about the science of life and improve health outcomes."

Casper concluded, "We look forward to welcoming QIAGEN's employees to

Thermo Fisher and are excited about the new opportunities we'll have to advance precision medicine through new molecular diagnostics and improved life sciences workflows."

**Benefits of the Transaction**

**Expands Specialty Diagnostics Portfolio with Attractive Molecular Diagnostics Capabilities, Including Infectious Disease Testing.**

Thermo Fisher has built leading specialty diagnostics capabilities, including allergy and autoimmunity, transplant diagnostics and clinical oncology testing. QIAGEN has a strong presence in molecular diagnostics with a product portfolio focused on infectious disease and other growth opportunities. The combined company will accelerate the development of higher-specificity, faster and more comprehensive tests that may improve patient outcomes and reduce the cost of care.

**Complementary Offering Enhances Unique Value Proposition for Life Sciences Customers.**

For life sciences researchers, QIAGEN's innovative sample preparation, assay and bioinformatics technologies are complementary to Thermo Fisher's genetic analysis and biosciences capabilities. As an example, with an expanded portfolio, Thermo Fisher will be able to provide research customers with broader capabilities to accelerate discovery and enable scientific breakthroughs.

**Commercial and Geographic Reach Expand Customer Access.**

Thermo Fisher will be able to leverage its extensive commercial reach, including its Fisher Scientific customer channels and comprehensive e-commerce platforms, to expand customer access to QIAGEN's product portfolio. Furthermore, given Thermo Fisher's leading presence in high-growth and emerging markets, QIAGEN will be able to further penetrate these regions.

**Delivers Attractive Financial Benefits through the PPI Business System, Including Proven Integration Approach.**

The transaction is expected to be immediately accretive to Thermo Fisher's adjusted EPS after close. Thermo Fisher expects to realize total synergies of $200 million by year three following the close, consisting of $150 million of cost synergies and $50 million of adjusted operating income benefit from revenue synergies.

**Financing and Approvals**

The transaction, which is expected to be completed in the first half of 2021, is subject to the satisfaction of customary closing conditions, including the receipt of

applicable regulatory approvals, the adoption of certain resolutions relating to the transaction at an Extraordinary General Meeting of QIAGEN's shareholders, and completion of the tender offer.

Thermo Fisher has obtained committed bridge financing. Permanent funding is expected to come from cash on hand and the issuance of new debt. The transaction is not subject to any financing condition.

**Advisors**

J.P. Morgan Securities LLC and Morgan Stanley & Co. LLC are serving as financial advisors to Thermo Fisher, and Wachtell, Lipton, Rosen & Katz is serving as legal counsel. For QIAGEN, Goldman Sachs International is serving as lead financial advisor and Barclays Bank PLC is serving as financial advisor, while De Brauw Blackstone Westbroek NV, Linklaters LLP and Mintz, Levin, Cohn, Ferris, Glovsky and Popeo P.C. are serving as legal counsel.

24.     In order to effectuate the Transaction, the Defendants agreed to certain restrictive and preclusive deal protection devices which impede the Company's ability to obtain a better offer or terminate the agreement. In fact, the Merger Agreement contains an exclusivity clause which prohibits the Individual Defendants from soliciting a better deal for the common stockholders, and delineates the duties of the Individual Defendants to promptly inform TFS should an alternative proposal be made, such that it hampers the ability of another counterparty to provide a better deal to stockholders. The termination payment under the Merger Agreement all but ensures no better offer will be forthcoming. According to Section 17.1.1, should QIAGEN terminate the Merger Agreement, it shall have to pay TFS $367,000,000 in cash, and so it creates a steep premium for any other potential bidder.

25.     This Transaction comes in the midst of the COVID-19 pandemic, at a time when stocks throughout the world are artificially deflated due to great uncertainty and radical economic change, here is no different. The Company's intrinsic value is not reflected in the Offer Price. This Transaction piggybacks off this uncertainty, providing a discount to TFS and unfairly compensating the Individual Defendants, at the expense of the common stockholders. Therefore,

it is imperative that stockholders receive the material information (discussed in detail below) that Defendants have omitted from the Registration Statement, which is necessary for stockholders to properly exercise their corporate suffrage rights and in order to cast an informed vote on the Transaction.

**The Recommendation Statement Omits Material Information**

26.     On May 18, 2020, Defendants filed the materially incomplete and misleading Recommendation Statement with the SEC.  The Individual Defendants were obligated to carefully review the Recommendation Statement before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Recommendation Statement misrepresents or omits material information that is necessary for the Company's stockholders to determine whether to tender their shares.

27.     ***First***, the Recommendation Statement omits material information regarding the analyses performed by Goldman Sachs and Barclays in rendering their fairness opinions.

28.     With respect to Barclays's *Selected Precedent Transaction Analysis*, the Recommendation Statement fails to disclose: (i) the inputs and assumptions for each of the transactions observed by Barclays; (ii) the assumptions for applying an Enterprise Value/LTM EBITDA multiple range of 18.0x to 22.0x; (iii) the projected net debt; and (iv) the range of illustrative enterprise values.

29.     With respect to Barclays's *Illustrative Discounted Cash Flow Analysis*, the Recommendation Statement fails to disclose: (i) the Company's terminal value; (ii) the assumptions for selecting a discount rate of 7.5% to 8.5%; and (iii) the assumptions for applying terminal value exit rates of 16.0x to 20.0x.

30.     With respect to Barclays's *Illustrative Present Value of Future Share Price*

*Analysis*, the Recommendation Statement fails to disclose: (i) the assumptions for utilizing multiples ranging from 22.0x to 26.0x; and (ii) the inputs and assumptions for selecting illustrative discount rates of 9.0% to 10.0%.

31.     With respect to Barclays's *Illustrative Selected Comparable Company Analysis*, the Recommendation Statement fails to disclose: (i) the metrics for the individual companies observed; and (ii) the inputs and assumptions underlying the selection of a range of 16.0x to 21.0x multiples of EV/Adjusted EBITDA.

32.     Similarly, with respect to Goldman Sachs' *Selected Precedent Transaction Analysis*, the Recommendation Statement fails to disclose: (i) the inputs and assumptions for each of the transactions observed; (ii) Goldman Sachs' assumptions for applying an Enterprise Value/LTM EBITDA multiple range of 18.0x to 22.0x; (iii) the projected net debt; and (iv) the range of illustrative enterprise values.

33.     With respect to Goldman Sachs' *Illustrative Discounted Cash Flow Analysis*, the Recommendation Statement fails to disclose: (i) the Company's terminal value; (ii) the assumptions for selecting a discount rate of 6.5% to 7.5%; and (iii) and Goldman Sachs' assumptions for applying terminal value exit rates of 16.0x to 20.0x.

34.     With respect to Goldman Sachs' *Illustrative Present Value of Future Share Price Analysis*, the Recommendation Statement fails to disclose: (i) Goldman Sachs' assumptions for applying the multiples ranging from 22.0x to 26.0x; and (ii) Goldman Sachs' full basis for applying an illustrative discount rate of 7.4%.

35.     With respect to Goldman Sachs' *Premia Analysis*, the Recommendation Statement fails to disclose the transactions observed by Goldman Sachs in the analysis. Likewise, with respect to Goldman Sachs' *Illustrative Selected Comparable Company Analysis*, the

Recommendation Statement fails to disclose the individual metrics for each of the Company's observed. Without this information, stockholders are unable to assess whether Goldman Sachs utilized reasonably comparable companies, or, instead, selected unreasonable companies in order to make the merger appear more favorable.

36.     Fairness opinions are fundamental to the M&A process and is ultimately what stockholders rely upon in their determination to vote for or against a transaction. Unfortunately, fairness opinions are also vulnerable to manipulation, which is why it is of the utmost important that stockholders have metrics available—such as those omitted here—to determine whether those metrics are reasonable, or whether they were unreasonably selected in order to obtain a finding of fairness. In valuing large transactions such as these, it becomes all the more critical. As one highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws of fairness opinions, in a financial analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…" *Id.* As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78. Therefore, in order for stockholders to determine whether to tender their shares they need access to the above information, and the omission of these metrics makes each financial analysis identified inherently misleading.

37. **Second**, the Recommendation Statement states that the Company entered into confidentiality agreements with other bidders. Yet, critically, the Recommendation Statement omits whether these agreements contained DADW provisions. The failure to plainly disclose the existence of DADW provisions creates the false impression that any of the parties who signed non-disclosure agreements could have made a superior proposal. If those confidentiality agreements contained DADW provisions, then those parties could only make a superior proposal by breaching the agreement—since in order to make the superior proposal, they would have to ask for a waiver, either directly or indirectly. Any reasonable shareholder would deem the fact that the most likely potential topping bidders in the marketplace may be precluded from making a superior offer to significantly alter the total mix of information.

38. This information has been found to be material by both California and Delaware Courts. Indeed, Plaintiff's attorneys have obtained injunctions on this very issue. *See e.g., In re Integrated Silicon Solution, Inc. Stockholder Litigation Consolidated Action*, Case No. 1-15-CV-278812 (injunction granted June 16, 2015 for failure to disclose DADW restrictions). Indeed, Courts have specifically ruled on this issue and held as to their materiality. For example, the Delaware Court of Chancery granted an injunction in *In re Ancestry.com Inc. S'holder Litig.*, Consol. C.A. No. 7988 (Del. Ch. Dec. 17, 2012), and held that stockholders are entitled to know about DADW clauses, that the Court was "not prepared to allow [the proposed merger] to go to a vote without the stockholders being told about [the DADW clauses]." *Id.* at 228. The Court specifically noted that, without this disclosure, the stockholders were operating under a "false

impression that any of the folks who signed the standstill could have made a superior proposal. That's not true. They could only make it by breaching the standstill." *Id.*

39.     ***Third and finally***, the Recommendation Statement fails to disclose potential conflicts of interest faced by the Company's Financial Advisors.

40.     Barclays may have faced conflicts of interest due to its holdings of securities in the Company, specifically the Recommendation Statement states:

> Barclays expects, based on its own assumptions and projections as of May 14, 2020, to make a payment of approximately $3 million to QIAGEN upon termination of the Bond Hedge and Warrant Transactions 2024 and expects to realize a net gain of approximately $2.6 million on the Bond Hedge and Warrant Transactions 2024 as a result of the Proposed Transactions.

The Recommendation Statement fails, however, to disclose that upon termination of the Bond Hedge and Warrant Transactions in 2024, the amount Barclays's would have expected to pay to QIAGEN and its net gain or net loss in the absence of the Tender Offer.

41.     Similarly, with respect to Goldman Sachs, the Recommendation Statement states that "assuming the Proposed Transactions were consummated on May 18, 2020, Goldman Sachs expects to realize a net gain of up to $20 million on the Bond Hedge and Warrant Transactions 2023 as a result of the Proposed Transactions." Yet, the Recommendation Statement fails to disclose, that upon termination of the Bond Hedge and Warrant Transactions 2023, the amount of Goldman Sachs' estimated payment to QIAGEN and net gain or net loss in the absence of the Tender Offer. Furthermore, the Recommendation Statement fails to disclose the fees which Goldman Sachs received from TFS's divestiture of its anatomical pathology business in April 2018.

42.     The fees which the Financial Advisors received or expected to receive from the Transaction, as well as any conflicts of interest which they faced are material information for

stockholders. As Professor Davidoff explains:

> [C]urrent fairness opinion practice is still deeply flawed. Fairness opinions, and their underlying valuation analyses, are prone to subjectivity and are frequently prepared utilizing methodologies that simply do not jibe with best practices. These defects are exacerbated by the recurring problem of investment banks who are conflicted in their provision of fairness opinions…conflict arises where a bank is asked to opine and advise on a transaction that it stands to benefit from only if the transaction transpires. In fact, under the fee structure explicated above the bank will not be paid if it cannot find fairness. This charge can be made even if the fairness opinion compensation is paid separate from the larger success fee. If the transaction occurs, the remaining overall compensation is significant enough to raise conflict issues.
>
> This explicit conflict is also accompanied by a more subtle one. The relationships between investment banks and corporate management can run deep, and an investment bank often has business with the corporation and its management that span more than one transaction. In these situations, investment banks may be influenced to find a transaction fair to avoid irritating management and other corporate actors who stand to benefit from the transaction.  This will ensure future lucrative business.

*Fairness Opinions*, 55 Am. U.L. Rev. at 1587.

43.    In sum, the omission of the above-referenced information renders the Recommendation Statement materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the upcoming special meeting of the Company's stockholders, Plaintiff will be unable to make an informed decision regarding whether to tender her shares, and she is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

### Against All Defendants for Violation of Section 14(e) of the Exchange Act

44.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

45.    Section 14(e) of the Exchange Act provides that it is unlawful "for any person to

make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading…" 15 U.S.C. §78n(e).

46.     Defendants violated § 14(e) of the Exchange Act by issuing the Recommendation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, in connection with the Tender Offer. Defendants knew or recklessly disregarded that the Recommendation Statement failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

47.     The Recommendation Statement was prepared, reviewed, and/or disseminated by Defendants.  It misrepresented and/or omitted material facts, including material information about the consideration offered to stockholders via the Tender Offer and the intrinsic value of the Company.

48.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(e). The Individual Defendants were therefore reckless, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Recommendation Statement, but nonetheless failed to obtain and disclose such information to stockholders although they could have done so without extraordinary effort.

49.     The omissions and incomplete and misleading statements in the Recommendation

Statement are material in that a reasonable stockholder would consider them important in deciding whether to tender their shares. In addition, a reasonable investor would view the information identified above which has been omitted from the Recommendation Statement as altering the "total mix" of information made available to stockholders.

50.     Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading.  Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Tender Offer, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

51.     The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of her entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the Expiration Time.

<u>**COUNT II**</u>

**Against all Defendants for Violations of Section 14(d)(4) of the Exchange Act
and SEC Rule 14d-9, 17 C.F.R. § 240.14d-9**

52.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

53.     Defendants have caused the Recommendation Statement to be issued with the intention of soliciting stockholder support of the Tender Offer.

54.     Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers. Specifically, Section 14(d)(4) provides that:

> Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

55.     SEC Rule 14d-9(d), which was adopted to implement Section 14(d)(4) of the

Exchange Act, provides that:

> Information required in solicitation or recommendation. Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof.

56.     In accordance with Rule 14d-9, Item 8 of a Schedule 14D-9 requires a Company's

directors to:

> Furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading.

57.     The omission of information from a recommendation statement will violate Section

14(d)(4) and Rule 14d-9(d) if other SEC regulations specifically require disclosure of the omitted

information.

58.     The Recommendation Statement violates Section 14(d)(4) and Rule 14d-9 because

it omits material facts, including those set forth above, which omissions render the

Recommendation Statement false and/or misleading. Defendants knowingly or with deliberate

recklessness omitted the material information identified above from the Recommendation

Statement, causing certain statements therein to be materially incomplete and therefore misleading.

Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material

information in connection with approving the Tender Offer, they allowed it to be omitted from the

Recommendation Statement, rendering certain portions of the Recommendation Statement

materially incomplete and therefore misleading.

59. The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of her entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the Expiration Date.

## COUNT III

### Against all Defendants for Violations of Section 20(a) of the Exchange Act

60. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

61. The Individual Defendants acted as controlling persons of QIAGEN within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of QIAGEN, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Recommendation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

62. Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

63. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act

violations alleged herein, and exercised the same. The Recommendation Statement contains the unanimous recommendation of each of the Individual Defendants to approve the Tender Offer. They were thus directly involved in preparing the Recommendation Statement.

64.     In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Recommendation Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

65.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

66.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Sections 14(e) and 14(d)(4) and Rule 14d-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

67.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Tender Offer or taking any steps to consummate the Tender Offer, unless and until the Company discloses the material information discussed above which has been omitted

from the Recommendation Statement;

      B.     Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

      C.     Awarding Plaintiff, the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

      D.     Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 29, 2020                                   **MONTEVERDE & ASSOCIATES PC**

                                          */s/ Juan E. Monteverde*
                                          Juan E. Monteverde (JM-8169)
                                          The Empire State Building
                                          350 Fifth Avenue, Suite 4405
                                          New York, NY 10118
                                          Tel: (212) 971-1341
                                          Fax: (212) 202-7880
                                          Email: jmonteverde@monteverdelaw.com

                                          *Attorneys for Plaintiff*